IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

J. HOLLY ANDERSON,                §
                                  §
      Plaintiff,                  §
                                  §
v.                                §    CIVIL ACTION NO. H-12-1537
                                  §
CAROLYN W. COLVIN,[1] ACTING      §
COMMISSIONER OF THE SOCIAL        §
SECURITY ADMINISTRATION           §
                                  §
      Defendant.                  §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 9) and Defendant's Cross Motion for Summary Judgment (Doc. 8).   The court has considered the motions, all relevant findings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and that Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant")

---

[1]      Michael J. Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position.  Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant.  See Fed. R. Civ. P. 25(d).

[2]      This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 6.

regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

## A.  Medical History

Plaintiff was born on October 26, 1948, and was fifty-five years old on October 31, 2003, the alleged onset date of disability.[3]  Plaintiff graduated from college with a Bachelor of Arts and worked as an account manager for telecommunications companies until she retired in August 2001.[4]  Plaintiff then performed contract work for her former employer as a sales representative for several months in 2002 and did the same in 2003 for an unrelated company until August 23 of that year.[5]

Between 2003 and 2010, Plaintiff suffered from musculoskeletal pain, restless leg syndrome ("RLS"), irritable bowel syndrome ("IBS"), carpal tunnel syndrome, and several other physical ailments.  Plaintiff first sought treatment for neck and back pain after injuring herself placing a bag in an airplane overhead compartment on August 22, 2003.[6]  Her primary care physician suspected that her pain was caused by bone spurs in her neck and referred her to a neurologist, Jeffrey Jackson, M.D., ("Dr.

---

[3]      See Tr. 85.

[4]      See Tr. 35, 155.

[5]      See Tr. 36-37, 143, 155.

[6]      See Tr. 63, 396.

2

Jackson"). [7]  Radiological studies were unremarkable, revealing no significant degenerative changes, no obvious bulge or protrusion, no spinal stenosis, and normal soft tissues. [8]  However, Dr. Jackson indicated that Plaintiff had been diagnosed with spondylosis, a degenerative spine disease, when he referred her to a physical therapist. [9]   Plaintiff attended twenty-two physical therapy sessions from September 18 to November 12, 2003. [10]

Dr. Jackson referred Plaintiff to a pain specialist, Uday Doctor, M.D., ("Dr. Doctor"), whom Plaintiff first visited on November 6, 2003. [11]   Dr. Doctor administered epidural steroid injections in an effort to mitigate her symptoms. [12]  The injections temporarily relieved Plaintiff's pain completely, but, in January 2004, she reported that she felt only seventy percent better on good days and thirty to forty percent better on bad days. [13]  At that time, Dr. Doctor noted that Plaintiff's CT scan did not show a significant disease. [14]  Four months later, a diskogram revealed a

---

[7]     See Tr. 198-99.

[8]     See Tr. 220-21.

[9]     See Tr. 227.

[10]    See Tr. 224.

[11]    See Tr. 238-39.

[12]    See Tr. 239.

[13]    See Tr. 242-43.

[14]    See Tr. 242.

posterior annual tear at the C7-T1 cervical disk.[15]   However, Dr.
Doctor noted that the tear was not painful; he was unable to
provoke any discomfort with the discography.[16]   In May 2004,
Plaintiff reported to Dr. Jackson that her back pain had still not
improved.[17]

Plaintiff then sought treatment from Jeanne Southern, M.D.,
("Dr. Southern"), a pain management specialist, and began seeing a
chiropractor, Dana Harper, D.C., ("Dr. Harper").[18]   At her first
session with Dr. Harper on July 20, 2004, Plaintiff reported
suffering from moderate to severe neck, upper back, and shoulder
pain that was interfering with her work, sleep, and daily routine.[19]
At her first visit to Dr. Southern on July 28, 2004, she described
her pain as "very debilitating."[20]   Dr. Southern noted that
Plaintiff was very tender around the C6-7 vertebrae.[21]   She
prescribed Nortriptyline and Bextra, and, over the next six weeks,
Plaintiff demonstrated steady improvement.[22]   On August 25, 2004,
Dr. Southern increased Plaintiff's Nortriptyline prescription from

---

[15]   See Tr. 240.

[16]   See id.

[17]   See Tr. 205.

[18]   See Tr. 335, 418.

[19]   See Tr. 336.

[20]   See Tr. 442.

[21]   See Tr. 423.

[22]   See Tr. 425-30.

4

fifty to seventy-five mg and prescribed Tramadol.[23]  On September 8, 2004, Plaintiff reported being "[a]lmost pain free!"[24]  Dr. Southern noted continued steady improvement on October 6, 2004, but Plaintiff complained about the side effects of Nortriptyline.[25]  Dr. Southern prescribed Cymbalta and recommended that Plaintiff reduce her dosage of Nortriptyline.[26]  On November 10, 2004, Dr. Southern instructed Plaintiff to discontinue the Nortriptyline and increased Plaintiff's Cymbalta prescription from forty to sixty mg.[27]  On December 8, 2004, Plaintiff reported that her pain had gotten worse.[28]  Dr. Southern prescribed another pain medication, Trazodone.[29]  Plaintiff's condition was much improved at her next appointment on December 29, 2004.[30]

In her first progress report with Dr. Harper, completed on January 17, 2005, Plaintiff reported "vast" improvement in her head, neck, and shoulder pain.[31]  Plaintiff characterized her pain

---

[23]    See Tr. 430.

[24]    See Tr. 431.

[25]    See Tr. 434.

[26]    See Tr. id.

[27]    See Tr. 434-35.

[28]    See Tr. 439.

[29]    See Tr. 440.

[30]    See Tr. 442.

[31]    See Tr. 363.

5

as "moderate."[32]  Plaintiff had seen Dr. Harper approximately twice per week for the first three months of treatment.[33]  Subsequently, she visited Dr. Harper approximately every other week through the end of 2009 for chiropractic treatment.[34]  Dr. Harper noted briefly that Plaintiff was experiencing neck and/or back pain in his notes for nearly all of Plaintiffs' appointments.[35]

Plaintiff's next appointment with Dr. Southern was on May 18, 2005, when Dr. Southern noted steady improvement in Plaintiff's back pain.[36]  On June 15, 2005, Plaintiff reported that her back pain remained improved.[37]  On August 31, 2005, Dr. Southern noted that Plaintiff's "back is better" and indicated that her condition had steadily improved.[38]

In Plaintiff's second progress report with Dr. Harper, dated December 22, 2005, Plaintiff noted "lessened" upper back pain.[39] She indicated that her condition had improved by eighty percent and characterized her overall improvement as "excellent."[40]   She

---

[32]    See id.

[33]    See Tr. 351-59.

[34]    See Tr. 360-412.

[35]    See Tr. 351-417.

[36]    See Tr. 444.

[37]    See Tr. 448.

[38]    See Tr. 451.

[39]    See Tr. 374-75.

[40]    See id.

6

indicated that she had been able to adhere to her appointment schedule, exercise program, and work and leisure activity restrictions ninety percent of the time.[41]  She stated that her pain was intermittent, occurring twenty-five percent of the time.[42]

In her following progress report, dated February 1, 2006, Plaintiff indicated that she was experiencing mild to moderate pain and that her condition had improved by eighty percent.[43]  At her January 11, 2006, appointment with Dr. Southern, however, Plaintiff noted that her pain was increasing and that she was suffering from lower back pain.[44]  Dr. Southern noted that Plaintiff was continuing to experience lower back pain at appointments on February 1, March 29, and April 17, 2006, though her chief complaints related to her RLS and IBS.[45]  Plaintiff also reported having trouble sleeping.[46]

On February 15, 2006, Plaintiff visited a neurologist, William Ondo, M.D., ("Dr. Ondo), after her RLS symptoms had worsened.[47]  In his evaluation, Dr. Ondo, at one point, noted that Plaintiff was experiencing neck pain and, at another, that a physical examination

---

[41]    See Tr. 375.

[42]    See Tr. 374.

[43]    See Tr. 378.

[44]    See Tr. 458-59.

[45]    See Tr. 460-72.

[46]    See Tr. 460.

[47]    See Tr. 268.

7

had revealed no joint or muscle pain.[48]  Plaintiff reported that
she had had difficulty sleeping due to her RLS and felt fatigued
during the day.[49]  At Plaintiff's appointment on July 18, 2006, Dr.
Southern noted that Plaintiff's back pain was "much better."[50]

Plaintiff's next appointment with Dr. Southern was on December
20, 2006, when she reported that her pain had worsened after a
rough boat ride.[51]  On May 5, 2007, Plaintiff indicated in an
updated case history for Dr. Harper that her pain occurred
occasionally, or twenty-five to fifty percent of the time.[52]  She
wrote that her condition "sometimes" interfered with her work,
sleep, and daily routine.[53]  Plaintiff next saw Dr. Southern on
June 6, 2007, when she reported that, although her condition had
continued to improve, she was still experiencing back pain.[54]  On
August 1, 2007, Plaintiff told Dr. Southern that she had researched
her symptoms and wondered if she had fibromyalgia, a rheumatic
disorder characterized by pain, tenderness, and stiffness of
muscles and associated connective structures.[55]  Dr. Southern noted

---

[48]    See Tr. 269-70.

[49]    See Tr. 268-69.

[50]    See Tr. 476.

[51]    See Tr. 477.

[52]    See Tr. 396.

[53]    See id.

[54]    See Tr. 479-80.

[55]    See Tr. 481; Merriam-Webster's Medical Dictionary 236 (1995).

"possible fibromyalgia" in her records.[56]   Plaintiff visited an internist, Elieen Stade, M.D., ("Dr. Stade"), on August 14, 2007.[57] Dr. Stade's records identify fibromyalgia as Plaintiff's chief complaint.[58]   Plaintiff brought in a two-page letter listing her symptoms and diagnoses.[59]  Dr. Stade noted that Plaintiff "seem[ed] to understand not all these symptoms are severe or unexpected."[60] Plaintiff complained of fatigue and "early morning wakening."[61]

At an October 3, 2007, appointment with Dr. Southern, Plaintiff reported that she was doing much better, and Dr. Southern noted slow improvement in her condition.[62]  Plaintiff next saw Dr. Southern on March 12, 2008, when she reported continued chronic back pain.[63]  She again reported chronic back pain, as well as trouble sleeping, at an appointment on July 16, 2008.[64] Plaintiff's next appointment with Dr. Southern was not until March 25, 2009.[65]  Dr. Southern noted that Plaintiff demonstrated slow

---

[56]   See Tr. 482.

[57]   See Tr. 325, 328.

[58]   See Tr. 325

[59]   See id.

[60]   See id.

[61]   See id.

[62]   See Tr. 484.

[63]   See Tr. 486.

[64]   See Tr. 487-88.

[65]   See Tr. 491.

improvement and that she would soon be seeing a rheumatologist, Samuel Pegram, M.D., ("Dr. Pegram") regarding possible fibromyalgia.[66]   On April 13, 2008, Plaintiff returned to the office where she had visited Dr. Stade and saw Sally Vetter, M.D., (Dr. Vetter).[67]   Plaintiff complained of feeling "wiped out" and stated that she did "not have energy like she used to have."[68] Plaintiff saw Dr. Vetter again on September 29, 2008, complaining chiefly of leg cramps and difficulty sleeping.[69]

Dr. Pegram evaluated Plaintiff on October 1, 2009, and diagnosed her with fibromyalgia.[70] A cervical x-ray also revealed mild multiple level spondylosis.[71] Dr. Pegram prescribed Sevella, and, at her follow-up appointment, Plaintiff reported that her pain had decreased and she was sleeping through the night for the first time in years.[72] At her next appointment, on March 1, 2010, Plaintiff reported that her pain level was controlled but her IBS had flared up and, although she was sleeping well, she still woke up feeling tired.[73]

---

[66]     See Tr. 492.

[67]     See Tr. 311.

[68]     See id.

[69]     See Tr. 308.

[70]     See Tr. 510.

[71]     See Tr. 515.

[72]     See Tr. 511.

[73]     See Tr. 512.

B.  **Application to Social Security Administration**

Plaintiff filed for disability insurance benefits on February 22, 2010, claiming an inability to work due to degenerative disc disease and fibromyalgia.[74]

In a disability report that Plaintiff completed near the time of her application, Plaintiff stated that she was five-feet-six-inches tall and weighed 169 pounds.[75]  She stated that she stopped working on August 23, 2003, because of her condition.[76]  Her medications at the time were Flexeril, Hyzaar, Levoxyl, Librax, Mobic, Requip, Savella, Ultram, and Zanaflex.[77]

Plaintiff stated that her daily activities included doing minor housework, taking care of her personal needs, walking her dog, preparing simple meals, watching television, and reading.[78] She reported that she shopped for food, clothes, and books in stores and by phone, mail, and computer.[79]  She stated that she went to her church and doctors' offices on a regular basis. According to the report, she also could also manage money, visit

---

[74]     See Tr. 85, 142.

[75]     See Tr. 142.

[76]     See Tr. 143.

[77]     See Tr. 146.

[78]     See Tr. 163-68.

[79]     See Tr. 166.

with friends over the phone and computer, drive a car, and walk for a quarter of a mile before needing to rest for a minute or two.[80] She noted that since the onset of her condition she could not be active one day without being exhausted the next.[81]  She stated that she could no longer entertain people or cook large meals because of her severe fatigue.[82]

Regarding her functional abilities, Plaintiff noted that her condition interfered with her ability to concentrate, lift, and bend.[83]  She indicated that it did not affect her ability to stand, reach, walk, sit, squat, climb stairs, use her hands, or complete tasks.[84]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[85]  In April 2010, a state agency medical consultant, Lana Minnigerode, M.D., reviewed Plaintiff's medical records and issued a technical denial on the basis that there was insufficient evidence to establish any condition, disabling or otherwise, which had sustained itself for twelve continuous months.[86]  This opinion was concurred with by John Durfor, M.D., in

---

[80]     See Tr. 167-68.

[81]     See Tr. 164.

[82]     See Tr. 165.

[83]     See Tr. 168.

[84]     See id.

[85]     See Tr. 522, 537.

[86]     See Tr. 522.

May 2010.[87]  Defendant explained, "medical reports show [Plaintiff] had some problems with [her] back pain, restless legs, and carpal tunnel [syndrome].  Medical information shows that [Plaintiff] received treatment for these conditions.  As long as [Plaintiff] continues to follow [her] doctor's orders, these conditions should remain under control."[88]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[89]  The ALJ granted Plaintiff's request and conducted a hearing on December 1, 2010.[90]

**C.  Hearing**

Plaintiff, Dr. Southern, and Karen Nielsen ("Nielsen"), a vocational expert, testified at the hearing.[91]  Plaintiff testified that she had worked as an account manager for AT&T and various spinoffs from 1977 until 2001, when her department was eliminated and she accepted early retirement.[92]  She contracted back to the same company for several months in 2002, working for commission as a sales representative.[93]  She then worked as a sales

---

[87]    See Tr. 537.

[88]    See Tr. 98.

[89]    See Tr. 99-100.

[90]    See Tr. 101.

[91]    See Tr. 32.

[92]    See Tr. 36.

[93]    See id.

representative for an unrelated company from the spring of 2003 until August 2003.[94]  Plaintiff stated that she subsequently tried working several commission-based jobs but was unable to keep them due to her health problems.[95]  She started receiving retirement benefits of approximately $35,000 a year in 2001.[96]

Plaintiff described her daily activities, stating that she watched television, read, painted, made beaded jewelry, and emailed friends and relatives.[97]  She related that she served on the board of directors of her homeowners' association, which met once monthly and required communication over email.[98]  She testified that she participated in two prayer ministries at her church, in addition to regularly attending worship services on Sundays and occasionally Wednesday night classes and dinners.[99]  She stated that from March to September 2010, when she injured her shoulder, she walked a mile with her dog every morning.[100]

Plaintiff testified that she had been experiencing the same symptoms since 2004.[101]  She stated that because of her pain and

---

[94]   See Tr. 37.

[95]   See id.

[96]   See Tr. 36.

[97]   See Tr. 57-59.

[98]   See Tr. 58, 61.

[99]   See Tr. 60.

[100]   See Tr. 46.

[101]   See Tr. 68.

fatigue she had been forced to cancel doctors' appointments and had been unable to attend many church services and homeowners' association commitments.[102]  She testified that "it would be really tough" to perform the duties of her prior job.[103]  She stated that she never did all-day activities and that usually she was not be able to be active for two days in a row.[104]

She stated that the amount of time she could sit varied from fifteen minutes to two hours at a time, depending on the day.[105] She stated that she would get up and move around regularly.[106]  She noted that she usually was able to stand for most of her hour-long physical therapy sessions but occasionally had to sit down.[107]

Plaintiff testified that the main obstacle keeping her from working was her inability to keep commitments:

> "I can't say I'll be somewhere at a specific time. I have dabbled in working for other people on commission.  I've thought of several businesses I could do on my own, and since I never know how I'm going to feel when I wake up the next day, and keeping a commitment is sacred to me, and it's also practical if you want to keep a job or run a business."[108]

---

[102]     See Tr. 66-67.

[103]     See Tr. 67.

[104]     See id.

[105]     See Tr. 52.

[106]     See id.

[107]     See id.

[108]     See Tr. 62.

Plaintiff explained that she had not applied for disability benefits until seven years after her alleged onset date because she was "used to taking care of [herself], and . . . did not get diagnosed until 2009 and had no notion . . . that fibromyalgia was something that you got a disability for."[109]

Dr. Southern appeared at the hearing and was examined by Plaintiff's attorney and the ALJ.[110] She gave her opinion that Plaintiff had been suffering from fibromyalgia since 2003 or 2004.[111] She testified that a delayed diagnosis is common in cases of illnesses that are difficult to diagnose, such as fibromyalgia, and admitted that she did "not really [know] a lot about fibromyalgia until fairly recently."[112] She stated that the treatment she had prescribed since 2004 was "very similar" to that prescribed by Dr. Pegram.[113] She testified that since 2003 Plaintiff's symptoms had been consistent with fibromyalgia.[114] Dr. Southern also spoke to Plaintiff's functional abilities, estimating that over the course of a week she could engage in "maybe a couple of half days" of sedentary activity and that after a half day of

---

[109]    See Tr. 61.

[110]    See Tr. 70-79.

[111]    See Tr. 76.

[112]    See Tr. 72.

[113]    See Tr. 73.

[114]    See Tr. 71-77.

activity she would have to rest for "at least the next day, sometimes the next several days."[115]   She recounted that "many times" Plaintiff had to cancel appointments because she could not get out of bed.[116]

Having reviewed the record and having heard Plaintiff's testimony, Nielsen categorized Plaintiff's prior work as an account manager as sedentary and skilled and her prior work as a sales representative as light and skilled.[117]  The ALJ asked Nielsen about vocational opportunities for a hypothetical person who could lift twenty pounds occasionally and ten pounds frequently; would need a sit/stand option at will; could stand and walk for six hours out of an eight-hour workday; could occasionally bend, stoop, crouch, crawl, balance, twist, and squat; could climb stairs but should never use ladders, ropes, or scaffolds; should limit her exposure to heights, dangerous machinery, and uneven surfaces; and could push or pull without limitation except for occasional difficulties pushing with the lower extremities bilaterally.[118]   Nielsen responded that the hypothetical person could perform Plaintiff's prior work as a sales representative and an account manager.[119]

---

[115]   See Tr. 76.

[116]   See Tr. 75.

[117]   See Tr. 80.

[118]   See id.

[119]   See Tr. 81.

Nielsen further testified that Plaintiff's skills were transferable to the jobs of account payable clerk and supervisor of accounting clerks.[120]

Plaintiff's attorney then examined Nielsen, asking whether an individual who, because of fatigue, could not frequently work the following day after a day of activities could perform the jobs Nielsen had identified.[121]  Nielsen responded that a person could not maintain those jobs while missing more than two and a half to three days per month.[122]

**D.   Commissioner's Decision**

On December 23, 2010, the ALJ issued an unfavorable decision.[123]  The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2007.[124]  The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had multiple impairments (musculoskeletal pain, restless leg syndrome, and irritable bowel syndrome) that were severe as of her date last insured.[125]  The ALJ

---

[120]    See Tr. 82.

[121]    See Tr. 83.

[122]    See id.

[123]    See Tr. 27.

[124]    See Tr. 17.

[125]    See Tr. 19.

concluded that Plaintiff had not established that she suffered from fibromyalgia prior to her date last insured.[126]

According to the ALJ, Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any Listing as of the date last insured.[127]  In particular, the ALJ considered Listings 1.04 (disorders of the spine), 5.01 (effects of irritable bowel syndrome), and 11.01 (effects of restless leg syndrome).[128]

In determining Plaintiff's residual functional capacity ("RFC") to perform work-related activities, the ALJ considered the opinion evidence as well as all symptoms and the extent to which these symptoms could be reasonably accepted as consistent with the evidence.[129]  The ALJ found that, through her date last insured, Plaintiff was capable of light work with a sit/stand option at will with the following limitations: lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; walking for six hours or less in an eight-hour workday; occasionally pushing with the lower extremities bilaterally; occasionally climbing stairs; never running or climbing ropes, ladders, or scaffolds; limiting exposure to heights, dangerous machinery, and uneven

---

[126]   See Tr. 20.

[127]   See id.

[128]   See id.

[129]   See Tr. 21.

surfaces; and occasionally bending, stooping, crouching, crawling, balancing, twisting, and squatting.[130]

Although the ALJ found that Plaintiff's medically determinable impairments could cause the alleged symptoms, he did not find her "statements concerning the intensity, persistence and limiting effects of these symptoms" to be credible to the extent they were inconsistent with the ALJ's RFC assessment.[131] The ALJ stated that Plaintiff's daily activities revealed a "significantly greater physical functional ability than alleged."[132]   The ALJ concluded that in light of the medical evidence, Plaintiff's "subjective allegations are exaggerated and unsupported by the record."[133]

The ALJ considered a questionnaire completed by Plaintiff's chiropractor, Dr. Harper, just prior to the hearing.[134] Dr. Harper stated that Plaintiff suffered from chronic neck, upper back, and mid-back pain with a severity level of six to seven on average.[135] He reported that he had "consistently found joint and muscle pain while treating [Plaintiff] over the last 6 years," and that Plaintiff had shown "very mild to no improvement in her

---

[130]   See id.

[131]   See Tr. 22.

[132]   See id.

[133]   See Tr. 23.

[134]   See Tr. 542.

[135]   See Tr. 538.

condition."[136]  He stated that Plaintiff had difficulty with daily activities because of her pain.[137]  He opined that Plaintiff's symptoms were severe enough to interfere frequently with attention and concentration and that Plaintiff was at that time unable to maintain employment due to her condition.[138]

Dr. Harper also assessed Plaintiff's residual capacity.  He stated that Plaintiff could lift twenty pounds occasionally and ten pounds frequently.[139]  He estimated that Plaintiff could walk two city blocks without rest, continuously stand for approximately forty-five minutes to an hour, continuously sit for up to one hour, and stand for a total of two hours and sit for a total of six hours in a given eight hour period.[140]  He indicated that Plaintiff required periodic walking twenty times per day.[141]  He estimated that Plaintiff required two rest periods of four hours per day and that Plaintiff was home-bound twenty days per month on average.[142] The ALJ gave some weight to Dr. Harper's opinions regarding

---

[136]   See Tr. 539, 541.

[137]   See Tr. 539.

[138]   See id.

[139]   See id.

[140]   See Tr. 540.

[141]   See id.

[142]   See Tr. 541.

Plaintiff's functional abilities to the extent they were consistent with the record.[143]

The ALJ addressed Dr. Southern's retrospective diagnosis, finding it to be inconsistent with the medical and other evidence and, accordingly, gave it little weight.[144]  Relying on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC limitations would be able to perform her past work as a project account manager and sales representative, the ALJ found that Plaintiff was not under a disability at any time from the alleged onset date through her date last insured.[145]  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[146]  Plaintiff then timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports the

---

[143]    See Tr. 24.

[144]    See Id.

[145]    See Tr. 25-26.

[146]    See Tr. 1-6, 126.

22

decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past

23

must be found "not disabled;" and (5) if the claimant is unable to perform [her] previous work as a result of [her] impairment, then factors such as [her] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

24

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III.  Analysis

Plaintiff requests judicial review of the Commissioner's decision to deny disability benefits.  Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  In particular, Plaintiff argues that: (1) the ALJ erred by failing to seek clarification or additional evidence from Dr. Southern; and (2) the ALJ erred by finding that Plaintiff suffered from no disability prior to her date last insured without consulting a medical advisor as to the onset date of disability.  Defendant argues that the decision is legally sound and is supported by substantial evidence.

### A.  <u>Contacting Dr. Southern</u>

Plaintiff contends that the ALJ was required to seek additional evidence from Dr. Southern to support or clarify her retrospective diagnosis of fibromyalgia.  An ALJ is only required to contact a physician if the evidence in the record is inadequate for the ALJ to determine whether the claimant is disabled.  20 C.F.R. § 404.1512 (eff. Aug. 1, 2006, to June 12, 2011). Plaintiff has failed to offer an explanation for how the record is insufficient in this case.  Dr. Southern testified to the bases of her opinion at the hearing, and the ALJ considered this evidence in addition to testimony from Plaintiff and the vocational expert, as well as medical records from several treating physicians spanning from Plaintiff's first complaints of pain in August 2003 to several months after her fibromyalgia diagnosis in September 2009.  The ALJ thus had an ample record on which to base his decision without needing to contact Dr. Southern for additional information.  Plaintiff bore the burden of proof on step four of the ALJ's analysis, and it is not the ALJ's responsibility to seek supplementation unless there appear to be "clear gaps in the administrative record."  See Newton v. Apfel, 209 F.3d 448, 458-59 (5th Cir. 2000).  There were no such gaps in the record here.

Plaintiff cites Newton to support her contention that the ALJ must seek additional evidence before finding a treating physician's opinion to be unsupported.  The Newton court, however, explicitly narrowed its holding to situations wherein the ALJ "determines that

the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight . . . *absent other medical opinion evidence based on personal examination or treatment of the claimant*." Newton, 209 F.3d at 453 (emphasis added).  Medical opinions are statements from acceptable medical sources such as physicians "that reflect judgments about the nature and severity" of a claimant's impairment, including a claimant's symptoms, diagnosis and prognosis, functional abilities, and physical or mental restrictions.  20 C.F.R. § 402.1527(a)(2).  Here, the record contained other medical opinion evidence from treating physicians, as noted above.

**B.  <u>Consulting a Medical Advisor</u>**

Citing <u>Spellman v. Shalala</u>, 1 F.3d 357 (5th Cir. 1993), Plaintiff contends that the ALJ erred by finding that Plaintiff suffered from no disability prior to her date last insured without consulting a medical advisor as to the onset date of disability. Construing Social Security Regulation 83-20, <u>Spellman</u> held that in certain cases an ALJ must consult a medical advisor when inferring the onset date of disability.  <u>Spellman</u>, 1 F.3d at 362.  This requirement, however, only applies in cases in which a determination has been made that the claimant is or was at one point disabled and the question arises as to when such disability began.  <u>See</u> <u>Atkins v. Chater</u>, 1995 WL 783427 *2 No. 95-10414 (5th Cir. Dec. 1, 1995) (unpublished) ("<u>Spellman</u>'s requirement the ALJ

consult with the Medical Advisor applies in cases in which a claimant has a disability and the entitlement issue turns on the date of that disability's onset."); SSR 83-20 1983 WL 31249 at *1 (1983) ("In addition to determining *that* an individual is disabled, the decision[-]maker must also establish the onset date of disability") (emphasis added).

"In title II worker claims, the amount of the benefit may be affected" by the determination of the onset date. SSR 83-20 at *1. In Spellman, for example, the plaintiff alleged an onset date of September 8, 1982, and was awarded benefits dating from October 1, 1985. Spellman, 1 F.3d at 359-60. The Fifth Circuit remanded the case, noting that "the Appeals Council failed to explain why October 1, 1985 was the proper onset date, and nothing in the record suggest[ed] that October 1, 1985 was significant with regard to Spellman's disability." Id. In cases such as the one at hand, where the ALJ finds that an individual is not disabled, Spellman has no application. See Barraza v. Barnhart, No. 02-10765, 2003 WL 1098841, at *1 (5th Cir. Feb. 11, 2003) (unpublished) ("[I]t was unnecessary for the ALJ to employ a medical advisor to determine an onset date of disability, because the ALJ determined Barazza was not disabled."). The ALJ thus committed no error by failing to consult a medical advisor.

## C. **Substantial Evidence**

28

Plaintiff argues that the ALJ's decision was not supported by substantial evidence.  Based on Plaintiff's RFC, the ALJ concluded that as of her date last insured Plaintiff could perform her prior work as an account manager and sales representative.

A claimant's RFC is her remaining ability to work despite all of her limitations resulting from her impairment.  See 20 C.F.R. § 404.1545(a); Villa v. Sullivan, 895 F.2d 1019, 1023 (5th Cir. 1990). In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairment affects her physical, mental, and other abilities, as well as the total limiting effects of her impairment.  See 20 C.F.R. § 404.1545.

After arriving at an RFC that takes into account all of the restrictions "reasonably warranted by the evidence," an ALJ may rely on the response of a vocational expert to a hypothetical question on job availability as it relates to a person with the claimant's limitations.  Dominque v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004); see also Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002).  In order to serve as substantial evidence, the vocational expert's testimony must be based on a hypothetical question that incorporates all of the limitations recognized by the ALJ and must be subject to the claimant's cross-examination.  See Masterson, 309 F.3d at 274; Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

The Commissioner appropriately applied these legal standards

in this case.  In formulating Plaintiff's RFC, the ALJ considered the medical records, Plaintiff's testimony regarding her daily activities and functional limitations, and the assessments of Drs. Harper and Southern.  The ALJ recognized several limitations regarding Plaintiff's physical abilities, including requiring a sit/stand option at will; lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; walking for six hours or less in an eight-hour workday; occasionally pushing with the lower extremities bilaterally; limiting her exposure to heights, dangerous machinery, and uneven surfaces; occasionally bending, stooping, crouching, crawling, balancing, twisting, and squatting; occasionally climbing stairs; and never running or climbing ropes, ladders, or scaffolds.[147]  This hypothetical included all of the restrictions set forth in the ALJ's decision.[148] Nielsen testified that Plaintiff could perform light work with the limitations set forth by the ALJ.[149]  Incorporating these restrictions, the ALJ posed a hypothetical question to Nielsen. She responded that Plaintiff could perform her past jobs as a sales representative and an account manager.[150]

After the ALJ posed the hypothetical, Plaintiff's attorney

---

[147]   See Tr. 80.

[148]   See Tr. 20-21.

[149]   See Tr. 80-81.

[150]   See Tr. 81.

cross examined Nielsen and asked if the hypothetical individual would be able to perform the identified jobs if she would not frequently be able to work the following day after a day of activities because of fatigue.[151]  Nielsen responded that this would "eliminate her employment" in these types of jobs.[152]

The ALJ decided, based on substantial evidence, that Plaintiff had not been so restricted prior to her date last insured.   In doing so, he gave little weight Dr. Southern's testimony at the hearing that over the course of a week Plaintiff could engage in "maybe a couple of half days" of sedentary activity, and that after a half day of activity she would have to rest for "at least the next day, sometimes the next several days."[153]  Dr. Southern did not say whether she believed Plaintiff's abilities were so restricted prior to her date last insured, although she did testify that Plaintiff had cancelled appointments in the past because of fatigue and that she had been experiencing the same types of symptoms since 2004.[154]  Dr. Southern opined that Plaintiff had been suffering from fibromyalgia since 2003 or 2004.[155]

The ALJ also gave little weight to Dr. Harper's opinions,

---

[151]    See Tr. 83.

[152]    See id.

[153]    See Tr. 76.

[154]    See Tr. 75.

[155]    See Tr. 76.

offered in his assessment completed prior to the hearing, that Plaintiff was home-bound approximately twenty days per month and consequently was unable to maintain employment due to her condition.[156] Dr. Harper did not offer an assessment of Plaintiff's abilities prior to her date last insured, though he stated that Plaintiff had shown "very mild to no improvement in her condition" since she began treatment.[157]

All medical opinions are to be considered in determining the disability status of a benefits claimant.  See 20 C.F.R. § 404.1527(b).  ALJs generally give more weight to opinions from treating sources, those who have an "ongoing treatment relationship" with the claimant, on account of their greater familiarity with a claimant's medical condition.  See 20 C.F.R. §§ 404.1502, 404.1527(d)(2).  Chiropractors do not qualify as "acceptable medical sources."  20 C.F.R. § 404.1513(d).  An ALJ "may use evidence" from such "other sources" to show the severity of an impairment and how it affects an individual's ability to function.  See SSR 06-03p 2006 WL 2329939 at *2 (2006).  However, such sources cannot be considered treating sources.  Id.

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.   See

---

[156]   See Tr. 539-41.

[157]   See Tr. 539.

Newton, 209 F.3d at 455.  An ALJ may decide to reject the "opinion of any physician when the evidence supports a contrary conclusion," including the opinions of treating physicians.  See Newton, 209 F.3d at 455-56 (internal quotation marks omitted).  However, opinions of treating physicians may be disregarded only when "good cause is shown."  Id.  Good cause exists when the treating physician's opinion is "conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." Id. at 456.

Here, the ALJ found Dr. Southern's opinion regarding the severity of Plaintiff's condition to be unsupported by the record, including Dr. Southern's records and the medical opinions contained therein.[158]  The ALJ relied on substantial evidence in making this finding.  The record indicates that, for much of the relevant period, Plaintiff's pain was well-controlled on medication and not severe or continuous.  The assessment of Plaintiff's chiropractor, Dr. Harper, likewise lacked support in the record, as seen in his own records, where Plaintiff noted continued significant improvement in her progress reports.  The ALJ accordingly only gave weight to Dr. Harper's opinions to the extent that they were consistent with the record.

Concerning Plaintiff's daily activities, the record shows that, after the alleged onset date, Plaintiff did housework,

---

[158]    See Tr. 23.

prepared meals, visited with friends over the phone and computer, and took care of her personal needs.  Plaintiff also engaged in leisure activities such as reading, watching television, making beaded jewelry, painting, ordering books online, and walking her dog up to a mile a day.  Furthermore, the records show that Plaintiff conducted business outside of her home after the alleged onset date (such as grocery shopping and serving on the board of directors of her homeowners' association) and engaged in social activities (such as attending services, classes, and dinners at her church).[159]  This constitutes further substantial record evidence supporting the ALJ's RFC determination and, thereby, the hypothetical individual described to Nielsen at the hearing.

The ALJ also determined that Dr. Southern's retrospective diagnosis was unsupported by the evidence.[160]  Given the objective medical evidence noted above, this finding by the ALJ was also supported by substantial evidence. Regardless, "the critical date is the date of *onset* of disability, *not* the date of diagnosis." Spellman, 1 F.3d at 363 (internal quotation marks omitted).  The court recognizes that fibromyalgia is inherently difficult to diagnose and that a credited retrospective diagnosis would have to some extent bolstered the credibility of Plaintiff's complaints. See Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003).

---

[159]   See Tr. 57-61, 163-68.

[160]   See Tr. 24.

Nonetheless, in this case, the record lacks support for a disability finding such that a credited retrospective diagnosis of fibromyalgia would not have changed the result.  See Brock v. Chater, 84 F.3d 726, 729 n.1 (5th Cir. 1996).

Because the ALJ determined Plaintiff's RFC on the basis of substantial evidence, posed a hypothetical that incorporated all of the RFC restrictions he recognized, and allowed the vocational expert to be cross-examined, there is substantial evidence to support the ALJ's RFC determination.

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court cannot overturn the decision.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross motion for summary judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the

United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 25<u>th</u> day of September, 2013.

_____
Nancy K. Johnson
United States Magistrate Judge
